# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| CONEX HOLDINGS, LLC, et al. | : | Case No. 11-10501(CSS) |
| | : | |
| Debtors. | : | Jointly Administered |
| _____ | : | |
| | : | |
| CHARLES A. STANZIALE, JR., in his | : | |
| capacity as the Chapter 7 Trustee of | : | |
| Conex International, LLC, f/k/a | : | |
| Conex International Corporation, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. Proc. No. 12-51170 (CSS) |
| v. | : | |
| | : | |
| Industrial Specialists Inc., a/k/a | : | |
| Industrial Specialists, LLC, | : | |
| | : | |
| Defendant. | : | |

## OPINION[1]

**GREENBERG TRAURIG, LLP**
Dennis A. Meloro
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801

Counsel for Industrial Specialists, Inc.
a/k/a Industrial Specialists, LLC

**McCARTER & ENGLISH, LLP**
Katharine L. Mayer
405 N. King Street, 8th Floor
Wilmington, DE 19801
-and-
Michael J. Reynolds
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Counsel to Plaintiff, Charles A. Stanziale, Jr., the Chapter 7 Trustee

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Dated:  December 18, 2014

Sontchi, J. _____

## INTRODUCTION

Before the Court is a motion for summary judgment filed by the defendant in a preference action seeking to recover transfers, pursuant to 11 U.S.C. sections 547 and 550. Defendant seeks summary judgment determining that the preferential transfers, if any, are not avoidable because they (i) were made in the ordinary course of business under section 547(c)(2)(A); and/or (ii) are barred by the Texas Construction Trust Fund Act.  For the reasons set forth below, the Court will grant the motion for summary judgment on the basis that the preferential transfers, if any, were made in the ordinary course of business.  As the transfers are not avoidable based on section 547(c)(2)(A), the Court need not rule on whether the action is barred under the Texas Construction Trust Fund Act.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2) and this Court has the judicial power to enter a final order.

## STATEMENT OF FACTS

**A.    Background and Procedural History**

On February 21, 2011 (the "Petition Date"), involuntary petitions for relief under chapter 11 of title 11 of the United States Code were filed against Conex International,

LLC ("Conex"), formerly known as Conex International Corporation; Conex Holdings, LLC; and Advance Blasting & Coating (collectively, the "Debtors").   On February 24, 2011, the Debtors' involuntary chapter 11 cases were consensually converted to voluntary cases under Chapter 7 of the Bankruptcy Code, and the Office of the United States Trustee appointed Charles A. Stanziale, Jr. as trustee for the Debtors' estates (the "Trustee" or "Plaintiff").

In December 2012, Plaintiff commenced this proceeding by filing a complaint against defendant, Industrial Specialists Inc. a/k/a Industrial Specialists, LLC ("Industrial Specialists" or "Defendant"), seeking to avoid and recover $1,181,583.84 in allegedly preferential transfers made by the Debtors to Industrial Specialists in the 90 days preceding the filing of the chapter 7 cases.   The parties have completed discovery.

Defendant has filed a motion for summary judgment (the "Motion"), which Plaintiff opposes.[2]   This matter is fully briefed and is ripe for the Court's consideration.

**B.      Relevant Facts**

In 2007, Brand Industrial was formed as a Delaware Limited Liability Company. That same year, Brand International acquired Industrial Specialists.   Industrial Specialists was the successor to Industrial Specialists of LA ("ISLA"), which had a Master Service Agreement with Debtors.   When Brand Industrial acquired Industrial Specialists, the Debtors consented to the assignment of the Master Service Agreement between ISLA and Debtors to Brand Industrial.   On December 16, 2009, Brand Industrial filed a Certificate

---

[2]  Adv. D.I. 35, 36, 38, 39 and 40.

of Amendment with the Delaware Secretary of State's Office, which amended its Certificate of Formation to change the name of the limited liability company to Industrial Specialists, LLC, effective as of January 1, 2010.  Defendants claim that Brand Industrial and Industrial Specialists are the same limited liability company that contracted with the Debtors.

Conex was a general mechanical contracting and industrial services firm. Industrial Specialists (and formerly Brand Industrial) were subcontractors to the Debtors in construction projects for oil refineries located in Texas.  The Debtors contracted with various owners of real property located in Texas to perform certain labor and furnish certain materials in connection with the construction and completion of the oil refineries. In turn, the Debtors subcontracted with Industrial Specialists to furnish certain labor and/or material in connection with these projects.

In the 90 days prior to the bankruptcy (the "Preference Period"), Conex made seven transfers (collectively, the "Transfers") to Defendant:

| Ref/Check No. | Check Issue Date | Check Clear Date | Check Amount |
|---|---|---|---|
| 362176 | 12/09/2010 | 12/17/2010 | $20,287.29 |
| 362353 | 12/16/2010 | 12/28/2010 | $1,508.48 |
| 362873 | 01/13/2011 | 01/24/2011 | $199,350.13 |
| 362987 | 01/17/2011 | 01/24/2011 | $6,330.70 |
| 363088 | 01/21/2011 | 01/28/2011 | $136,050.84 |
| 363208 | 01/24/2011 | 01/31/2011 | $448,091.52 |
| 363385 | 02/07/2011 | 02/14/2011 | $369,964.88 |
| | | Total: | $1,181,583.84 |

The Trustee seeks to recover these Transfers as preferential.  Defendant asserts that each of the Transfers were made in the ordinary course of the relationship between Conex and Defendant.[3]

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c), made applicable to these proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment should be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,"[4] after considering the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."[5]

In deciding a motion for summary judgment, all factual inferences must be viewed in the light most favorable to the nonmoving party.[6]  After sufficient proof has been presented to support the motion, the burden shifts to the nonmoving party to show that genuine issues of material fact still exist and that summary judgment is not appropriate.[7]

---

[3]  Defendant also asserts that the Texas Construction Trust Fund Act ("TCTFA") bars the Trustee from establishing a *prima facie* case for the preference claims.  However, as the Court finds that the Transfers were made in the ordinary course, which is a complete defense to this preference action, it is not necessary for the Court to discuss or rule on the TCTFA defense.

[4]  Fed. R. Civ. P. 56(a).

[5]  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

[6]  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–588 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).

[7]  *Id.* at 587.

A genuine issue of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.[9]  The same principles apply in a bench trial where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[10]  In a situation where there is a complete failure of proof concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[11]

## DISCUSSION

### A.    Preferential Transfer

"A preference, in simplest terms, is an eve-of-bankruptcy transfer to a creditor. The creditor that receives a preferential payment recovers 100% on its claim where, in all likelihood, other unsecured creditors receive less."[12]  The six requirements that the Trustee must establish to make a preference voidable are: (1) a transfer is made; (2) on

---

[8]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[9]  *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

[10]  *In re Broadstripe, LLC,* 444 B.R. 51, 76-77 (Bankr. D. Del. 2010) (citing *Leonard v. General Motors Corp. (In re Headquarters Dodge),* 13 F.3d 674, 679 (3d Cir. 1993).

[11]  *Id.* at 77-78 (citing *Celotex Corp.*, 477 U.S. at 317-18).

[12]  *Friedman's Inc. v. Roth Staffing Companies, L.P. (In re Friedman's Inc.)*, Case No. 09-10161, 2011 WL 5975283, *2 (Bankr. D. Del. Nov. 30, 2011) (citations omitted).

account of antecedent debt; (3) to or for the benefit of the creditor; (4) while the debtor was insolvent; (5) within 90 days of the filing of the petition; (6) that left the creditor better off than it would have been if the transfer had not been made and it had asserted its claim in a chapter 7 liquidation.[13]

If Defendant has a complete defense to the Trustee's claim for preferential transfers then the above factors do not have to be considered.  As such, the Court will turn to Defendant's defenses to these claims.

**B.     The Preferential Transfers, If Any, Are Not Avoidable As They Were Made In The Ordinary Course Of Business Between The Debtor And Defendant.**

Section 547(c)(2) permits a "safe harbor" for a transferee of a preferential payment if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was— (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms."[14]  Accordingly, the Court is left to determine whether any or all of the transfers were made in the ordinary course of business of the Debtor and Defendant, or made according to "ordinary business terms."

---

[13] 11 U.S.C. § 547(b).

[14] 11 U.S.C. § 547(c)(2).  As this Court has previously discussed "[t]he statute is written in the disjunctive and only one element need be proven to insulate the transfer from avoidance.  But, prior to 2005, the statute was more stringent and the defendant had to establish both that the transfer was made in the ordinary course of business and under industry norms."  *Stanziale v. Southern Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 518 B.R. 269, 279 (Bankr. D. Del. 2014) (hereinafter "*Conex/Southern Steel*").

### i.    Parties' Arguments

Defendant asserts that in the pre-preference period payments (the "Historical Period") were generally received between 41 and 70 days after invoice, excluding various outliers.   In comparison, during the Preference Period, all payments were received between 41 and 68 days.   Thus, Defendant claims that each transfer in the Preference Period was (i) received squarely within the historic range of days after invoice and is consistent with the parties' prior course of dealings; (ii) was made on account of debts incurred by the parties in the ordinary course of business; and (iii) was a continuation of normal financial relations between the Debtors and Defendant.   Defendant argues that this is proved by the following:

|  | Average Days to Pay | Average Range of Days to Pay | Median |
|---|---|---|---|
| Historical Period (actual) | 61 | 41-95 | 62 |
| Historical Period (excluding 4 outliers) | 56 | 41-70 | 55 |
| Preference Period | 54 | 41-68 | 55 |

In its analysis, Defendant asserts that the Court should exclude four (4) payments made over 70 days after the invoice date in the Historical Period.   Without the outliers, Defendant argues that the course of business between the Debtors and Defendant was the same in the Historical Period and the Preference Period.

The Trustee responds that the above data is skewed, arguing that 12 out of 14 invoices (86%) paid in the Preference Period were paid within 55 days of the date of invoice.   In contrast, only 8 out of 20 invoices (40%) paid in the Historical Period were paid within 55 days of the invoice date.   The Trustee argues that this drastic change (the

percentage of invoices paid within 55 days of the invoice date more than doubled) shows that the payments of invoices accelerated in the Preference Period.  The Trustee's analysis is as follows:

|  | Dollar-Weighted Days Sales Outstanding ("DSO") Analysis | Percentage of Invoices Paid Within 70 days of the Invoice Date |
|---|---|---|
| Historical Period (actual) | 79.0 | 38.09% |
| Preference Period | 60.6 | 100% |

The Trustee continues that comparing the actual Historical Period to the Preference Period using Defendant's methodology also shows that the payments in the Preference Period were paid, on average, one week earlier in the Preference Period.  The Trustee also argues that there is no "principled basis" for removing the outliers (20% of the payments in the historic period) from the analysis, i.e., Defendant includes historical payments made 70 days after invoice as "ordinary" by Defendant but not payments made 77 and 78 days after invoice.  The Trustee asserts that Defendant removed unfavorable payments to create a "skewed ordinary course analysis."  The Trustee's last argument is that the payee in the Historical Period was, in some instances, Brand Industrial, rather than Industrial Specialists; and in attempting to establish its historical course of business, Defendant bears the burden of showing that the payments were actually made payable to it (as opposed to some other entity).

### ii.    Discussion

Under 11 U.S.C. § 547(c)(2), the "ordinary course of business exception" permits a creditor to retain transfers made by a debtor to a creditor during the 90 days before the

petition date if such transfers were made for a debt incurred in the "ordinary course of business" of the parties; and either (1) the transfers were made in the "ordinary course of business" of the parties; or (2) the transfers were made in accordance with "ordinary business terms."[15]

The party contending that the transfer falls under one of the exemptions bears the burden of proving that assertion by a preponderance of the evidence.[16]  In the context of a motion for summary judgment, the burden of proof remains with the party asserting the nonavoidability of the transfer, i.e., Defendant.  The Trustee simply needs to point to the absence of such proof to make its case.[17]

Here, the parties do not dispute that the debt was incurred in the ordinary course of business.  The Debtor operated as a general industrial contractor, and Defendant was a subcontractor employed to assist on a construction project.  In addition, Defendant has not sought a determination in the Motion that the payments were made in accordance with ordinary business terms.

Rather, the only question before the Court is whether the payments made to Defendant occurred in the ordinary course of business.  The determination of whether a creditor has met its burden under section 547(c)(2)(A) is a subjective test, "calling for the

---

[15] *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 241 (Bankr. D. Del. 2010) *aff'd sub nom. In re Archway Cookies LLC*, 511 B.R. 726 (D. Del. 2013) (footnotes and citations omitted).

[16]  11 U.S.C. § 547(g); *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir.1999).

[17]  *See, e.g., J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990) (citations omitted).

Court to consider whether the transfer was ordinary as between the debtor and the

creditor."[18]  Courts have considered a myriad of factors in this test, including: (1) the

length of time the parties engaged in the type of dealing at issue; (2) whether the subject

transfers were in an amount more than usually paid; (3) whether the payments at issue

were tendered in a manner different from previous payments; (4) whether there appears

to have been an unusual action by the debtor or creditor to collect on or pay the debt; and

(5) whether the creditor did anything to gain an advantage (such as additional security)

in light of the debtor's deteriorating financial condition.[19]   No one factor is

determinative.[20]  To determine whether transfers were in the ordinary course of business

the Court must first determine what the ordinary course of business was and then

compare the preferential transfers to it.[21]

In situations where the parties have a long history of dealings, the focus in

determining the ordinary course of the parties' business is on those dealings.  The Third

Circuit has stated:

> when the relationship in question has been cemented long
> before the onset of insolvency-up through and including the
> preference period-we should pause and consider carefully
> before further impairing a creditor whose confident,

---

[18] *First Jersey Sec., Inc.*, 180 F.3d at 512  ("…[T]he determination of what is 'in the ordinary course of business' is subjective, calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor.").

[19] *Sass v. Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.)*, 476 B.R. 124, 135-36 (Bankr. D. Del. 2012) (citing *Archway Cookies*, 435 B.R. at 242; and *In re Hechinger Inv. Co. of Delaware, Inc.*, 320 B.R. 541, 548–49 (Bankr. D. Del. 2004)).

[20] *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2010).

[21] *Id.*

consistent, ordinary extension of trade credit has given the straitened debtor a fighting chance of sidestepping bankruptcy and continuing in business. Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy. On the other hand, where the relationship is of recent origin, a significant departure from credit terms normal to the trade bears the earmarks of favoritism and/or exploitation, and to countenance such behavior could be unfair (or could appear unfair) to the remaining creditors who exhibit the virtue of patience. [22]

Here, the Debtor and Defendant had been doing business for approximately 16 months, which is of sufficient duration for the Court to determine the ordinary course of business between them.[23]

---

[22] *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 224-25 (3d Cir. 1994) (citations omitted). As section 547(c)(2) has been amended since *Molded Acoustical Products*, this Court has stated:

> The problem, however, is that this [*Molded Acoustical Products*] case law was developed at a time when the defense required a showing that the transfer was both in the ordinary course of the parties' relationship and under industry norms. Thus, it was logical to require a more stringent showing of the second factor of a two-part test when evidence relating to the first part of the test was incomplete or absent. But, there is no longer a two-part test. Since the amendment of the statute in 2005 under BAPCPA, the elements have been independent. . . . To be consistent with the current statutory structure, the Court cannot import the industry practice into its review of the parties' business relationship. The Court must do the best it can with the evidence before it as to the parties' relationship.

*Conex/Southern Steel* at 282. In *Conex/Southern Steel*, unlike in the case *sub judice*, the relationship between the Debtor and the preference defendant began within preference period (*i.e.* within the 90 days before the bankruptcy petition was filed). *Id.* at 283. In the case *sub judice*, the Debtor and Defendant had a relationship over the course of 16 months, which is sufficient to establish the "ordinary course of the parties' relationship." Thus, the question raised in *Conex/Southern Steel* as to whether industry norms can be considered in determining the parties' relationship is simply not at issue here.

[23] *Troisio v. E.B. Eddy Forest Products Ltd. (In re Global Tissue, L.L.C.)*, 302 B.R. 808, 814 (D. Del. 2003) *aff'd sub nom. In re Global Tissue L.L.C.*, 106 F. App'x 99 (3d Cir. 2004) (duration of the parties' relationship was

Next, the Court must compare transfers made within the Preference Period to those made in the course of dealings between the parties prior to the Preference Period. Courts place particular importance on the timing of payment in determining the ordinary course of business between parties.[24]  Small deviations in timing might not preclude a finding of ordinariness, while greater deviations in timing are more likely to preclude a finding of ordinariness.[25]  Overall, this inquiry is intensely fact specific.[26]

The Court will begin with the Trustee's asserted dollar-weighted days ("DSO") analysis argument.  The Trustee relies on *In re Hechinger Inc. Co. of Delaware, Inc.*[27] in support of the DSO argument.  In *Hechinger*, a few months prior to the debtors' bankruptcy, the defendant changed the debtors' credit terms from "1% 10 days, net 30, with a 7-day mail float" to "1% 7 days, net 8."  Under the former terms, the debtors could earn a 1% price reduction for invoices paid within the "discount period," or, in other words, ten days plus a seven-day grace period for payments made by mail; furthermore, the debtors had up to 30 days to pay in order for the payment to be considered prompt.[28] The later terms contained a $1 million credit limit for future purchases, a 1% price

---

approximately 15 months).  *See also In re Molded Acoustical Products, Inc.*, 18 F.3d at 225 (duration of parties' relationship was approximately 18 months).

[24]  *In re Archway Cookies*, 435 B.R. at 243 (*quoting Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Adv. No. 08–51184(PJW), 2009 WL 2004226, at *5 (Bankr. D. Del. July 9, 2009)).

[25]  *Archway Cookies*, 435 B.R. at 243.

[26]  *Burtch c. Texstars, Inc. (In re AE Liquidation, Inc.)*, No. 08-13031 (MFW), 2013 WL 5488476, at *4 (Bankr. D. Del. Oct. 2, 2013) (*citing Goldstein v. Starnet Capital Grp., LLC (In re Universal Mktg., Inc.)*, 481 B.R. 318, 327 (Bankr.E.D.Pa.2012)).

[27]  *Hechinger Inv. Co. of Delaware, Inc. v. Universal Forest Prod., Inc. (In re Hechinger Inv. Co. of Delaware, Inc.)*, 489 F.3d 568 (3d Cir. 2007).

[28]  *Id.* at 571.

reduction for invoices paid within the seven day "discount period" and had up to eight days to pay in order for the payment to be considered prompt, among other restrictions.[29] The defendant argued that as the alleged preference payments were made within the credit terms they were presumptively in the ordinary course.  The bankruptcy court determined that the payments made by the debtors to the defendant during the preference period were not "'made in the ordinary course of business or financial affairs of the debtor and the transferee' within the meaning of § 547(c)(2)(B) because the changes . . . [the defendant] had imposed on . . . [the debtors] were 'so extreme, and so out of character with the long historical relationship between these parties.'"[30]

On appeal, the Third Circuit found that the debtors were pressured to make accelerated payments during the preference period because of defendant's enforcement of its credit limit.[31]  The Third Circuit pointed out the vigorous enforcement of the credit limit by comparing the timing in which the debtors paid the invoice to the defendant, i.e., in the preference period, the debtors paid 96.5% of its invoices within 0-10 days from the date of invoice; while, in the comparable period for the three preceding years, only 10% of invoices were paid within 0-10 days from the date of invoice.[32]  The Third Circuit went

---

[29] *Id.*

[30] *Id.* at 577 (*quoting Hechinger Liquidation Trust v. Universal Forest Prod., Inc. (In re Hechinger Inv. Co. of Delaware, Inc.),* 326 B.R. 282, 292 (Bankr. D. Del. 2005) *aff'd sub nom. In re Hechinger Inv. Co. of Delaware Inc.,* 339 B.R. 332 (D. Del. 2006) *aff'd in part, vacated in part, remanded sub nom. In re Hechinger Inv. Co. of Delaware, Inc.,* 489 F.3d 568 (3d Cir. 2007)).

[31] *Id.* at 578.

[32] *Id.*

on to compare the debtors' outstanding balance with the defendant, i.e., in the preference

period, the debtors' balance ranged from $1 million owed to a $1 million credit balance;

while, in the historical period, the debtors' daily balance was always greater than $1

million and was generally between $3-4 million.[33]  The Third Circuit also noted that the

bankruptcy court did not find the credit limit to be the deciding factor.[34]  The bankruptcy

court considered the newly imposed credit limit, the change in terms, the new

requirement that payments needed to be made by wire transfer.[35]  As stated by the Third

Circuit in affirming the bankruptcy court's ruling:

> The Bankruptcy Court also properly considered the length of
> time the parties had engaged in the type of dealing at issue,
> the way the payments were made, whether there appeared to
> be any unusual action by either the debtor or creditor to
> collect or pay on the debt, and whether the creditor did
> anything to gain an advantage in light of the debtor's
> deteriorating financial condition.  Each of these factors
> weighed in favor of a finding that the disputed transfers were
> not "ordinary" under § 547(c)(2)(B).[36]

Although argued by the Trustee, the *Hechinger* Court did not use, nor mention, the DSO

methodology in its analysis (or any other statistical calculation, for that matter) in

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* (citations omitted).  The Third Circuit continued that "[i]n essence, a month before the beginning of the preference period, UFP [defendant] tightened its credit terms, imposed a credit limit, required Hechinger [debtor] to make payments by wire transfer in large, lump-sum amounts, and required Hechinger to send remittance advices after making payment on invoices. This was not the ordinary course of dealing between the parties." *Id.*

determining whether preferential transfers were within the ordinary course. Nor will this Court.[37]

In the Historical Period, the Debtor made 20 transfers to Defendant. It is notable that the parties do not dispute the invoice dates or the payment dates – they only dispute how to calculate the range of payments and their import. The range of payments was 41-95 days after invoice. Defendant argues that four (4) of these transfers should be excluded from consideration as they are "outliers" (made 95, 81, 78, and 77 days after invoice). The Trustee disagrees that the outliers should be disregarded.[38] Here, the difference in average days to pay in the Historical Period and Preference Period, inclusive of outliers, is seven (7) days or, excluding the outliers, two (2). The Court does not find either difference to be problematic or to take the preferential transfers outside of the normal

---

[37] *See also In re Am. Home Mortgage Holdings, Inc.*, 476 B.R. at 138 (*quoting In re Global Tissue L.L.C.*, 106 Fed.Appx. at 102) ("As stated by the Third Circuit, as is the case here, the 'Trustee's reliance on the average payment time, as is often the case with statistics, does not portray the complete picture' of the payment history.").

[38] *Davis v. R.A. Brooks Trucking, Co., Inc. (In re Quebecor World (USA), Inc.)*, 491 B.R. 379, 387-88 (Bankr. S.D.N.Y. 2013) ("The Court rejects it here as well because that proposed methodology captures outlying payments that skew the analysis of what is ordinary. The Court turns instead to the more commonly used "average lateness" method, which looks to the average time of payment after the issuance of the invoice during the historical and Preference Periods."). *See also Sparkman v. Queenscape, Inc. (In re Anderson Homes, Inc.)*, No. 09-02062-8-SWH, 2012 WL 5617446, at *5 (Bankr. E.D.N.C. Nov. 15, 2012) ("The defendant has offered no evidence or facts that might lead this court to believe that a handful of anomalous payments is truly representative of the ordinary course of business between the defendant and debtor."); *Yaquinto v. Arrow Financial Services (In re Brook Mays Music Co.)*, 418 B.R. 623, 629 n. 7 (Bankr. N.D. Tex. 2009), as amended (Oct. 20, 2009) (excluding one transfer that was clearly an outlier or aberration). *But see Bridge Assoc., LLC v. C & D Marine, LLC (In re Torch Offshore, Inc.)*, No. 05-10137, 2008 WL 2475746, at *3 (Bankr. E.D. La. June 18, 2008) ("The court finds that on average there was no significant difference in the time period for payment by the debtor when the preference period is compared to the pre-preference period. Although there may be a couple of outliers in terms of the range of the time period for payment, these aberrations occur in both the preference period and the pre-preference period, and the court does not find them to be payments that fall outside the normal course of business between the parties.").

course of dealings between the Debtor and Defendant.[39]  Thus, even when including the

outliers, the timing of the payments was in the ordinary course of business.

The Trustee also asserts that Defendant has not met its burden because it did not

identify the payee.  The Trustee asserts that any payments made out to "Brand Industrial

Solutions, LLC" (or any other entity other than the named Defendant) should not be

included in the historical period.   However, Defendant submitted uncontroverted

evidence to support the name change from Brand Industrial Solutions, LLC to Industrial

Specialists, LLC (the named Defendant).[40]   Defendant's evidence includes the State of

Delaware Certificate of Amendment, Brand Industrial Solutions LLC Certificate of

Formation and the certification of the Secretary of State of the State of Delaware certifying

the aforementioned certificates.  Based on these certificates, the Court concludes that the

payments made by the Debtor to Brand Industrial Solutions, LLC and those made to

Industrial Specialists, LLC are, in fact, payable to the same entity.  As such, Defendant

---

[39] *See, e.g., In re Global Tissue, L.L.C.*, 302 B.R. at 812 (holding that while the debtors made their payments a bit faster during the preference period than during the pre-preference period, the payment rate was still within the normal range of the parties' dealings); *Huffman v. N.J. Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 737–38 (Bankr. W.D. Va. 1995) (holding that a difference between 54 days pre-preference and 67 days during the preference period did not make the payments out of the ordinary course of business); *Branch v. Ropes & Gray (In re Bank of New England Corp.)*, 161 B.R. 557, 561 (Bankr. D. Mass. 1993) (holding that a difference between 38.4 days pre-preference and 54.7 days did not take the payments out of the ordinary course of business).  *But see Burtch v. Prudential Real Estate and Relocation Services, Inc. (In re AE Liquidation, Inc.)*, No. 08-13031 (MFW), 2013 WL 3778141, at *6 (Bankr. D. Del. July 17, 2013) (holding that payments in the preference period that were 17 days faster than the historical period were outside the ordinary course of business, among other reasons).

[40] *See* Motion at Exhibit A (Declaration of Kim L. Blankenship In Support of Brief in Support of Defendant's Motion for Summary Judgment).  Adv. D.I. 36.

has met its burden in showing that the payments made in the Historic Period were made to the same entity as the payments made in the Preference Period.

Furthermore, there is no evidence of change in the amount of the subject transfers such that payments in the Preference Period were in an amount more than usually paid; nor that the payments were tendered in a different manner from previous payments; nor that Defendant took any unusual action to collect such debts from the Debtor; nor that Defendant did anything to gain an advantage as a result of the Debtor's deteriorating financial condition.  The Court finds that the evidence of the range of payments is adequate for Defendant to carry its burden that the payments made during the Preference Period were similar to those made during the Historical Period.

### iii.    Conclusion

Based on the length of relationship between the Debtor and Defendant, the timing of payments, and the historical billing practices, the Court finds that the Transfers were made in the ordinary course of business and are therefore not voidable pursuant to section 547(c)(2)(A).

### CONCLUSION

For the foregoing reasons, the Court will grant the Motion and enter summary judgment in favor of Defendant by finding that the Transfers are not voidable as they are protected by the ordinary course defense set forth in section 547(c)(2)(A).  An order will be issued.